UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHRISTINE MUNIZ, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | No. |
| ) | |
| CITY OF CHICAGO, ) | |
| CHICAGO POLICE DETECTIVE CHARLES ) | |
| HERNANDEZ, CHICAGO POLICE DETECTIVE, ) | |
| JOHN HENDRY, UNKNOWN OFFICERS, ) | |
| COOK COUNTY ) | |
| COOK COUNTY ) | |
| MEDICAL EXAMINERS OFFICE ) | |
| LATANJA M. WATKINS ) | |

## COMPLAINT

Plaintiffs, hereinafter referred to as "Plaintiff", by his undersigned attorneys, brings this Complaint against Defendants, CITY OF CHICAGO, CHICAGO POLICE DETECTIVE HENDRY, CHICAGO POLICE DETECTIVE HERNANDEZ, COOK COUNTY MEDICAL EXAMINERS OFFICE and LATANJA M. WATKINS, and as grounds states as follows:

## GENERAL ALLEGATIONS

1. This is a civil action for violations of Plaintiff's civil rights pursuant to 42 U.S.C. § 1983 and Illinois state law for deprivations under color of law of the Plaintiff's rights as secured by the Constitution of the United States of America and the laws of the State of Illinois.

2. This is an action for damages in excess of $75,000.

## THE PARTIES

3. Plaintiff, Christine Muniz, is a resident of Frankfort, IL, which is located in Will County, IL.

4. Christine Muniz is the natural Mother of David Carroll, who was pronounced dead August 2, 2021. At the time of his death, his residence was located in Cook County, IL.

5. Cook County is a governmental entity situated in Cook County, IL. The Cook County Medical Examiner's Office operates in Cook County Illinois, with a principal place of business located at 2121 W Harrison St, Chicago, IL.

6. Defendant Dr. LATANJA M. Watkins, at all material times, was employed but the Cook County Medical Examiner's office.

7. Defendant, Chicago Police Department is a duly recognized entity organized under the City of Chicago.

8. Defendant Detective Charles Hernandez at all material times hereto, was an employee of the City of Chicago Police Department. At all times relevant to this Complaint, Defendant Hernandez was employed by and acted under the scope of his employment as a duly appointed police officer of the Chicago Police Department.

9. Defendant Detective John Hendry at all material times hereto, was an employee of the City of Chicago Police Department. At all times relevant to this Complaint, Defendant Hernandez was employed by and acted under the scope of his employment as a duly appointed police officer of the Chicago Police Department.

10. Unknown Officers at all material times hereto, was an employee of the City of Chicago Police Department. At all times relevant to this Complaint, unknown officers were employed by and acted under the scope of their employment as a duly appointed police officer of the Chicago Police Department.

11. Defendant, City of Chicago, is a municipal corporation, pursuant to 745 ILCS 10/1-206, organized under the laws of the State of Illinois. The City of Chicago is responsible for the policies, procedures, and practices implemented through its various agencies, agents, departments, and employees, and for injuries occasioned thereby. The City of Chicago is or was the employer and indemnifying entity of all Chicago Police Department defendants (hereafter, "City Defendants").

## JURISDCITION AND VENUE

12. This Court has jurisdiction over this action because it involves an action under federal law, namely 42 USC § 1983. Venue is proper because the Defendants within close geographic proximity to the Northern District. The remaining allegations result from the same facts and occurrences as the claim under 42 USC 1983.

## BACKGROUND FACTS REGARDING ALL COUNTS

13. David Thomas Carroll resided at 2616 Mozart St, Chicago, IL.

14. On July 21, 2021, Mr. Carrol exited Banyan Rehab Center from an in-patient treatment session and returned to his residence.

15. On July 25, 2021, his family became worried as no communication had been heard from David Carrol for several days, which was unusual.

16. It was commonplace for David Carroll to remain in contact with Christine Muniz and very unusual for him not to return texts or calls.

17. Mrs. Muniz began a private search for David, calling hospitals, medical examiners office.

18. On September 6, 2021, Mrs. Muniz gained access to David's apartment. Upon entry she immediately realized something was wrong. Mrs. Muniz called Chicago Police to report her findings.

19. Christine Muniz and her husband had been to David's apartment on multiple occasions. The were familiar with his apartment.

20. Based on prior experience, Christine Muniz knew the apartment to be tidy and knew that David liked to keep everything, including his shoes in their particular place.

21. Upon entry into the premises, Christine Muniz and her husband knew in their hearts that they were standing in a crime scene. There was a muddy sheet on David's bed, as if something large (like a person) had been wrapped in the sheet.

22. A woman's earing was found tangled up in the muddy sheet. David lived alone. The rest of the apartment smelled like bleach, aside from the muddy sheet and bed.

23. Christine Muniz immediately contacted Chicago Police and asked them to come look at the apartment and process the scene.

24. Ms. Muniz explained the circumstances of her find and the fact that food was left out as if David inexplicably stopped cooking in the middle of a meal, the presence of the muddy sheet, and smell of bleach.

25. Chicago Police refused to come to the apartment.

26. At this point David had been missing for 30 days. Chicago Police, at that point, should have escalated his missing persons report and done a search of his apartment per state statute and CPD's own directives. However, Chicago Police refused to investigate.

27. David's mother was specifically told by Officer Hernandez that David's disappearance was not a high priority and that David was an "alcoholic" and therefore was not a priority.

28. Ms. Muniz explained to the Defendants that while her son had previous issues with alcohol, that David had been doing really well, was stably employed, had money in

3

the bank, and checked into treatment facilities when he needed extra support in order to maintain his employment and stay on the right path. Ms. Muniz explained to Officer Hernandez and other Chicago police that is why her son had just left Banyan on a self check in.

29. However, Officer Hernandez and Chicago Police refused to investigate stating to Ms. Muniz that there were "more important cases than an alcoholic that is probably in the gutter somewhere."

30. Christine Muniz later found out, that David was found deceased along with another man in a suspicious manner on August 2, 2021, ONE MONTH BEFORE her call on September 6, 2021.

31. On September 6, 2021, unbeknownst to Christine Muniz, David's body was in possession of the Cook County Medical Examiner's office.

32. The Cook County Medical Examiner's office, at that time, had David listed as a black male John Doe, despite the fact that he had 9 pieces of identification on his person when his body was discovered. These identifications were photographed and in the possession of both the medical examiner's office and the Chicago Police.

33. Despite having numerous forms of identification on his person, which were photographed by Chicago PD, David had been identified as an unknown black male. David is white.

34. On September 13, 2021, Christine Muniz again requested the Chicago Police come look at the apartment and process the scene reiterating her concerns. Chicago Police again refused.

35. Christine Muniz was so convinced her son's apartment was a crime scene, that she began calling the Cook County Medical Examiner's office, requesting to know if there were any unidentified bodies that fit David's description, fearing the worst.

36. Because she had not heard from David in so long and she had fears related to David's apartment, Christine Muniz called Cook County Medical Examiner's office in excess of 10 times trying to determine if her son's body had been brought to the Medical Examiner's office. Each time, she was told they did not have her son's body, when they in fact did.

37. Despite the Chicago Police Department's refusal to investigate, Christine Muniz began her own investigation.

38. Many weeks after Christine Muniz requested the Chicago Police to come to her son's apartment to investigate the premises, Christine Muniz contacted Chicago Police again and requested a follow up as she had gained some information that she thought would be helpful.

4

39. Christine Muniz told Chicago Police she had cell phone records that looked suspicious with unknown numbers and that calls and texts just stopped on or about July 27, 2021.

40. Chicago Police again refused to take her claims seriously.

41. The actions (or inactions) of Chicago Police caused Christine Muniz to feel isolated, hopeless, insulted, and depressed. Chigo Police, specifically officer Hernandez, repeatedly told Ms. Muniz that her son's life was not important and that despite her valid concerns and potential evidence of a crime, they had better things to do than investigate.

42. On September 22, 2022 Ms. Muniz again called Chicago Police to let them know she had some additional information, but she was told that officers were being sent to her home. Chicago Police would not tell her why the officers were coming to see her.

43. In her heart, she knew they had discovered David's body.

44. Before officers arrived, Ms. Muniz called the Cook County Medical Examiner's office. She again asked if David's body was in their possession. She was again told, no.

45. Christine Muniz pushed and told the Medical Examiner's Office that Chicago Police officers were on the way to her house. She was then informed by the Cook County medical examiner's office that David's body was in their possession since August 2, 2021. David was listed as an African-American John Doe and therefore, her prior calls were dismissed. Again, David Carroll is a white male.

46. At the time of his death, David Carroll had identification on his person, which was photographed by Chicago Police.

47. Ms. Muniz obtained photographs of the crime scene and autopsy (to the extent one was performed).

48. The autopsy photos show that David is clearly white, with some blood pooling in areas to make his skin dark. However, large portions of his body are exposed and it is clear, to even a lay person, that David is white.

49. Despite having identification on his person, neither the Chicago Police Department, nor the Chicago Medical Examiner's office were able to identify him for a significant period of time despite Ms. Muniz's calls and request for investigation.

50. David's body was recovered from a Mercy Housing located at 4707 N. Malden Avenue, Chicago.

51. Months after he was found deceased, David's state issued ID was located at the front desk of that facility.

52. On the date his body was discovered, David's body was found at the same time as another man.

53. Based on the crime scene photographs, it appears that the two men were in very different states of decomposition.

54. The Police report indicates that the ventilation fan in the kitchen of the Malden apartment was running.

55. It is believed by Plaintiff, that the ventilation fan was running to hide the smell of David's body.

56. David's body was found without shoes.

57. David's body was found laying on the floor.

58. David's shoes were not located in the apartment that his body was discovered in.

59. Ms. Muniz has had multiple conversations with Detectives Hendry and Hernandez regarding her son's disappearance and eventual recovery of his body.

60. Neither could explain why her request for investigation were denied.

61. Neither could explain why David's apartment was not processed for evidence. Neither could explain why his body was unidentified.

62. Nobody can explain how he was described as an African American John Doe.

## THE PHONE

63. Subsequent to the discovery of David's body, Ms. Muniz learned that the Chicago Police were in possession of David's phone.

64. She was told by an unknown CPD officer that she could come and get the phone.

65. Thereafter, Ms. Muniz visited Chicago Police department. At that time, she spoke with Detective Hernandez to request her son's phone.

66. Detective Hernandez refused to give her the phone, belittled her, and placed his hand on his gun in an effort to threaten her.

67. She was then told by another unknown officer that Detective Hendry had to release the phone to her.

68. Ms. Muniz thereafter spoke to Detective Hendry. Detective Hendry stated that he had to have a phone bill or some document that could identify the phone. Ms. Muniz then went to the carrier and retrieved the documentation requested.

69. Upon returning to the police station, Detective Hendry reviewed the documents, but stated that the phone was not in his possession, it was at "ERPS."

70. Ms. Muniz pressed the issue and told the phone is evidence and could not be returned at that time, even though her son's death had already been considered an accidental overdose by Chicago Police.

71. Chicago Police, including Hernandez and Hendry, have told her that they believe David's death was an accidental overdose.

72. Ms. Muniz informed Detective Hernandez and Hendry multiple times that she wants the phone so she can see if there are any messages, pictures, or other data on the phone's memory that could either give her some piece or provide a clue as to what happened.

73. In 2023, Ms. Muniz was told she could retrieve the phone. Hernandez and Hendry informed Mrs. Muniz that she needed to go to the station in person to retrieve the phone.

74. Again, Ms. Muniz has attempted to retrieve the phone. On one occassion she was told the officer needs to release it and she cannot have it, because either it is in a different location, or that she needs certain paperwork.

75. In late 2023 an internal affairs investigation was opened related to this matter. Seargent Guzman, who lead the investigation, located the phone pursuant to her complaint.

76. In or around March 2024, Sargent Guzman indicated via phone the inventory number, how to retrieve the phone, and exactly what to do. *See* Exhibit A, attached.

77. Ms. Muniz visited ERPS per the directions of Sargent Guzman. She was told by an unknown officer that the phone was in the ERPS facility, but she had the wrong form. He provided her the note attached as Exhibit B.

78. Sargent Guzman thereafter was contacted by counsel for Ms. Muniz and sent the appropriate form. *See* Exhibit A.

79. In April 2024, Ms. Muniz again visited ERPS. An unknown officer told her "the phone is not here and never was."

80. Even though Ms. Muniz followed Seargent Guzman's instructions TWICE (March and April of 2024), she was again refused retrieval of the phone.

81. Chicago Police have intentionally seized David's phone and kept same from Christine and David's family, who have a right to reclaim the property. The actions of Chicago Police, including Detectives Hendry and Hernandez constitute a deprivation of property under the 4th and 14th Amendments.

82. Said deprivation of rights and property has been ongoing and continuous, with the most recent denial and withholding of property occurring as recently as April 2024.

## MONELL ANALYSIS

83. The deprivation of the property described above has been ongoing. Christine Muniz has attempted no less than 5 times to retrieve her son's phone between 2021 and 2024.

84. Each time Ms. Muniz has attempted to retrieve the phone, she has been given different directions. She has been told to go to different locations. She has been told the phone was not in possession of Police. He has been told it is held at a station only to be told it is in an evidence lock-up.

85. During an internal affairs investigation in early 2024, Ms. Muniz complained about this issue to Sargent Guzman. Sargent Guzman graciously took it upon himself to locate the phone and informed Mrs. Muniz that she, and only she, could retrieve the property and that she had to do so with her ID and in person.

86. Ms. Muniz followed his directions in March of 2024, only again to be told she needed different paperwork.

87. By e-mail attached as Exhibit A, counsel for Ms. Muniz informed Detective Guzman of this development and he provided a form for Ms. Muniz to take after she was denied the phone pursuant to his prior directions.

88. She was again denied and told the paperwork was not correct by an unknown officer.

89. There are three possibilities, all of which constitute a violation of 42 USC 1983 and satisfy the requirements to implicate a local government pursuant to Monell v Dept. of Soc. Services:

   a. The withholding of the property is done pursuant to Chicago Police policy, practice, custom, and continued acts of multiple members of Chicago Police have given her different information and has a high probability of inflicting injury (wrongful possession) upon the public; or

8

b. The custom, practice, or policy relating to retention or property and release of same is confusing and/or unclear to officers of the Chicago Police and has a high probability of inflicting injury (wrongful possession) upon the public; or

c. The actions of multiple members of Chicago Police, some identities are unknown at this time, constitute a pattern and practice of Chicago Police to frustrate, retain, misdirect, and illegal hold the property of citizens, which has a high probability of inflicting injury upon the public.

## MEDICAL EXAMINER

90. The Medical Examiner's office took possession of David's body on or about August 2, 2021.

91. David's body was recovered with 9 pieces of identification.

92. His body was photographed and an autopsy was performed.

93. On his autopsy report, he was listed as a black john doe. His photographs show he is white.

94. On or about August 8, CPD sent information that they believed the body to be that of David based on tattoo match. The medical examiner did not identify him or update their records. He remained unidentified.

95. According to 50 ILCS 722/15 (b) (2) Any coroner or medical examiner with custody of human remains that are not identified within 24 hours of discovery shall promptly notify the Illinois State Police of the location of those remains. A coroner or medical examiner with custody of human remains that are not identified within 72 hours of discovery shall promptly notify the Federal Bureau of Investigation of the location of those remains and the failure to identify the remains.

96. The Medical Examiner did not comply with 50 ILCS 722/15.

97. The Chicago Medical Examiner's office completely failed. If Ms. Muniz had not kept pushing, she may never have found out her son had passed.

## COUNT I
## VIOLATION OF 42 U.S.C. § 1983

98. Plaintiffs restate and reallege all prior allegations as though fully set forth herein.

99. Chicago Police Officers protect and serve the residents of the Chicago and have a duty, under the color of Illinois law and the ordinances of the Chicago, to enforce the law.

100. OAs detailed above, (specifically paragraphs 63-83, infra), Officer Hendry, Officer Hernandez and Unknown Officers violated the constitutional rights of Ms. Muniz as guaranteed by the 4th and 14th Amendments as follows:

   a. Failed to return David's phone.
   b. Improperly seized David's phone and kept same from Plaintiff without warrant or cause;

101. The overriding purpose of constitutional government in the United States has been to provide for the use of sufficient power to maintain order, stability, and security for the liberties of the people.

102. By failing to adequately perform their duties and unlawfully retaining property, Defendants Unknown Officers, Detective Hendry, and Detective Hernandez deprived Plaintiff of her rights under the 4th and 14th Amendments to the United States Constitution.

103. Had the Officers acted properly in the scope of their employment, Plaintiffs would not have been deprived of their Constitutional rights and protections. As such, there is a causal link between the Officers' actions and Plaintiffs' Constitutional injury.

104. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983.

   WHEREFORE, Plaintiffs pray for judgment as follows:

   a. Attorneys' Fees and Costs under 42 U.S.C §1988;
   b. Costs of suit;
   c. Punitive Damages;
   d. Any other further relief as the Court deems just and appropriate.

## COUNT II
### Respondeat Superior Against City of Chicago

105.   Plaintiff restates and realleges paragraphs 1 through 98.

106. Defendant City of Chicago was at all material times relevant herein, the employer of Unknown Officers, Defendants Detective Hernandez and Detective Hendry.

107. Unknown Officers Defendant Hernandez and Hendry committed the acts alleged in this complaint in the course and within the scope of their employment.

108. Therefore, all of the individual City defendants' acts and omissions are directly chargeable to the City of Chicago pursuant to the doctrine of respondeat superior

WHEREFORE, Plaintiff prays for judgment against City of Chicago, as follows:

a. Any damages proved at trial;
b. Attorneys' Fees;
c. Costs of suit;
d. Any other further relief as the Court deems just and appropriate.
e.

## COUNT III
## RECKLESS INFLICTION OF EMOTIONAL DISTRESS AGAINST COOK COUNTY MEDICAL EXAMINER'S OFFICE AND LATANJA M. WATKINS

109. Plaintiff had previously filed a Complaint against theses Defendants on September 20, 2022 in Cook County.

110. Said Complaint was dismissed without prejudice, with leave to refile on February 16, 2024, pursuant to Sections 2-1009(a) and 13-217 of the Code.

111. Plaintiff restates paragraphs 1-91.

112. To sustain an action for reckless infliction of emotional distress: (1) the conduct giving rise to it must be so outrageous in character and so extreme in nature as to go beyond all possible bounds of decency; (2) the emotional distress was so severe that no reasonable person could be expected to endure it; and (3) despite a high probability that such severe emotional distress will follow, the actor goes ahead with the conduct in conscious disregard of that probability.

113. Before September 22, 2021, Christine Muniz placed approximately a dozen or more phone calls to the Cook County Medical Examiner's office to try and determine if her son was there.

114. Christine Muniz described him in detail including tattoo description, height, and weight.

115. On or about August 8, CPD sent information that they believed the body to be that of David based on tattoo match. The medical examiner did not identify him or update their records. He remained unidentified.

116. According to 50 ILCS 722/15 (b) (2) Any coroner or medical examiner with custody of human remains that are not identified within 24 hours of discovery shall promptly notify the Illinois State Police of the location of those remains. A coroner or medical examiner with custody of human remains that are not identified within 72 hours of discovery shall promptly notify the Federal Bureau of Investigation of the location of those remains and the failure to identify the remains.

117. The Medical Examiner did not comply with 50 ILCS 722/15.

118. Latanja M. Watkins filled out a Report of Postmortem examination, with examination performed August 3, 2021.

119. The date the report was signed was November 1, 2021.

120. The first page of the exhibits to the report lists David Carroll as a black male.

121. Autopsy photographs clearly show he is a white male.

122. Plaintiff does not believe an actual autopsy was performed.

123. On September 22, 2022, Plaintiff Muniz found out that Cook County Medical Examiner's Office had David Carroll's body identified as a Black John Doe. Prior to that, Ms. Muniz could not have known of their negligence.

124. The Medical Examiner's Office has standard operating procedures. They state in part:

- Double check the Decedents Identification.
- If available, check any hospital wristbands or toe tags, to ensure you have the correct name for the body you are about to bring in. If the decedent has a hospital wristband and/or toe tag a photo needs to be taken by using the overhead camera and the computer to the left of the triage desk.
    - 3 photos must always be taken: Whole body, upper body and lower half and the case number plaque **must** be present for all photos.
    - For COVID positive bodies, we only take a whole-body photo with the case number shown on the body bag.

125. The ME office did not follow these guidelines among others.

126. The Cook County ME office had a special duty as it relates to Christine Muniz.

127. The Supreme Court of Illinois has created a four-part test to apply when analyzing whether a plaintiff may utilize the special duty rule:

"(1) The municipality must be uniquely aware of the particular [***16] danger or risk to which plaintiff is exposed; (2) there must be specific acts or omissions on the part of the municipality; (3) the specific acts must be affirmative or willful in nature; and (4) the injury must occur while the plaintiff is under the direct and immediate control of municipal employees or agents."

See Sims-Hearn v. Office of the Med. Exam'r, 359 Ill. App. 3d 439 (1st 2005)

128. Christine Muniz informed the Cook County Medical examiner's office that her mental health was suffering due to this issue, and that she found his apartment in a suspicious nature. As such Cook County ME was aware of the particular risk.

129. Despite having the knowledge that Christine Muniz was suffering emotional distress and that severe emotional distress will follow, Cook County Medical Examiner's office continued their conduct in conscious disregard of that probability and made no effort to identify her son, as outlined above and below in paragraph 124.

130. The Cook County Medical Examiner's Office exhibited the following behavior that was beyond the bounds of decency and breached their special duty;

   a. Told Christine Muniz numerous times that her son was not their problem.
   b. Told Christine Muniz David's body was not present;
   c. Failed to take reasonable efforts to identify her son, including following up on his ID.
   d. Incorrectly listing him as a black John Doe.
   e. Failed to take any step at all to identify David Carroll's body, despite photographing nine forms of identification and having his description;
   f. Failed to perform any reasonable investigation whatsoever.
   g. Did not provided a proper autopsy.
   h. Did not follow their own SOPs;
   i. Violated 50 ILCS 722/15.

131. All of the acts described above were willful.

132. As Ms. Muniz was helpless to do anything about the situation, all she could do was wait for information and results from the Cook County ME office. As such, plaintiff was under the direct and immediate control of municipal employees or agents.

133. As a direct and proximate cause of their reckless conduct Christine Muniz suffered severe emotional distress and mental anguish causing physical symptoms that were treated medically.

WHEREFORE, Plaintiff prays for judgment against Lantanja M. Watkins and the Cook County Medical Examiners Office, including any unknown employees as follows:

   a. Medical bills;
   b. Mental Anguish,
   c. Emotional Distress;
   d. Any damages proven at trial;
   e. Costs of suit;
   f. Any other further relief as the Court deems just and appropriate.

## COUNT IV
### Respondeat Superior Against Cook County

134. Plaintiff restates and realleges paragraphs 1 through 46 and 79-95 as fully set forth herein.

135. Defendant Cook County was at all material times relevant herein, the employer of Defendant Watkins and the Cook County Medical Examiners Office.

136. Defendants Watkins and the Unknown employees of Cook County Medical Examiners Office committed the acts alleged in this complaint in the course and within the scope of their employment.

137. Therefore, all of the individual defendants' acts and omissions are directly chargeable to Cook County pursuant to the doctrine of respondeat superior.

WHEREFORE, Plaintiff prays for judgment against Cook County, as follows:

    a. Any damages proved at trial;
    b. Attorneys' Fees;
    c. Costs of suit;
    d. Any other further relief as the Court deems just and appropriate.

Dated: July 15, 2024

Respectfully submitted,

By_____
Attorney for Plaintiff

Christopher M. Jahnke (cmj@jtlawllc.com)
JAHNKE SULLIVAN & TOOLIS, LLC
FIRM: 44138
9031 W. 151st Street
Suite 203
Orland, Park, Illinois 60462
(708) 349-9333